791 A.2d 314

CHARLES RAWITZ AND JOHN T. LYONS, JR., PLAINTIFFS, v. THE COUNTY OF ESSEX, THE BOARD OF CHOSEN FREE-HOLDERS OF THE COUNTY OF ESSEX AND JANE DOE AND/OR JOHN DOE, OFFICIALS, EMPLOYEES AND/OR AGENTS OF THE COUNTY OF ESSEX, CATHERINE E. TAMA-SIK AND STEPHEN EDELSTEIN, DEFENDANTS.

Superior Court of New Jersey
Law Division Essex County

June 15, 2000.

*Sanford R. Oxfeld, (Oxfeld Cohen),* Attorney for plaintiff.

*Domenick Carmagnola,* appearing (*Lum, Danzis, Drasco, Positan & Kleinberg*), Attorneys for defendants.

KLEIN, J.S.C.

Plaintiff, Charles Rawitz (hereinafter known as "plaintiff" and/or "Rawitz") is a former employee of the Essex County Counsel's Office. After his termination from employment effective July 26, 1996, he filed a civil action seeking, *inter alia,* additional compensation pursuant to *N.J.S.A.* 40A:9–6 for services allegedly performed as Chief and/or Acting Chief of the Claims Section from April 23, 1993 until his termination.

Summary judgment was granted in favor of defendants on September 22, 1998. On appeal, the order dismissing plaintiff's

claim under *N.J.S.A.* 40A:9–6 was reversed. The Appellate Division ruled that summary judgment was improvidently granted because of evidence that created a "genuine issue as to material fact" as to whether plaintiff held, de facto, the position of Chief of the Claims Section of the Office of Essex County Counsel.

The matter was remanded to the Law Division for trial on that issue. The court heard testimony on February 16 and 17, 2000 and reserved decision pending the submission of briefs by both sides.

The relevant facts as found by the court essentially are as follows. In October 1986, Rawitz was hired as an Assistant County Counsel and was assigned to the Claims Section. On January 3, 1987, he was directed to and did assume the duties of Chief of that Section on an interim basis until April 30, 1987, when a new Chief was hired. On or about April 23, 1993, Gloria Cherry, then Chief of the Claims Section, was terminated. At that time, Rawitz was not appointed as, nor was he given the title of, Chief of the Section or Acting Chief of the Section. Unlike the events of 1987, no one came to him and asked him to assume the Chief's duties. Nevertheless, he performed whatever job duties were required to maintain the daily operations of the office. Throughout the entire period, he was never given the title of Section Chief and never purported to assume that position. He never represented to anyone that he was Chief or Acting Chief of the Claims Section.

It is clear to the court that after the departure of Ms. Cherry in April 1993, plaintiff's workload increased. He assumed Cherry's caseload and the following duties: 1) review of all incoming correspondence; 2) response to correspondence (i.e. initial notice of suit) or direction to others to do so; 3) response to requests for Tort Claims Act forms; 4) review of Notices of Claims; 5) initiation of investigation, where indicated; 6) review of results of investigations; 7) preparation of or review of responsive pleadings; 8) assignment of case files to assistants; 9) consultation regarding trial strategy; 10) determinations concerning depositions and oth-

er discovery; 11) authorization of settlement depending upon funds available; 12) trial of cases. Plaintiff testified that these duties, performed by him after April 23, 1993, were the same duties he performed in 1987 when he was formally designated as Acting Chief of the Claims Section. He also testified that a number of these duties, particularly # 1–4 and 11, were not performed by him as an Assistant County Counsel. There is no evidence that a formal written job description, specifying the duties of the Section Chief, existed at any time relevant to this matter.

Rawitz functioned with very little in the way of support staff, and what there was lacked legal experience. The office hired several assistants at various times between 1993 and 1996, namely Joseph Minish, Ginger Provost, Nancy Oberst Rothstein, and Jennifer Remington. All of these people, with the exception of Provost, were fledgling lawyers. It appears that Minish and Oberst were hired in the fall of 1993, and then left for the County Prosecutor's Office several months later "in exchange for" Provost. Remington was a newly admitted attorney hired toward the latter part of plaintiff's tenure. Minish and Provost testified that they reported to, and were supervised by, Rawitz. Neither of them were ever told what his title was, but they regarded him as their "boss" Because Rawitz was not as comfortable with federal practice, all of the federal cases were assigned to Provost, who handled the day-to-day responsibilities for discovery and motions on those cases. However, she consulted frequently with plaintiff because she had no prior experience as a civil litigator. There is no indication that Rawitz had any hiring, disciplinary, or termination authority with respect to any of these individuals.

The evidence also reflected that Rawitz lobbied his superiors for a raise because of his augmented workload, as set forth in a memo to Stephen J. Edelstein, County Counsel, on November 17, 1993. There, plaintiff stated his case that the understaffed nature of his office caused him to do a "job that four (4) lawyers used to do" and pointed out that he had not received any increments under the

Assistant County Counsel's contract for a three year period. Significantly, he did not ask for compensation as Acting Chief and did not request a change in title during the period of his employment.

In this lawsuit, plaintiff claims that he is entitled to additional compensation pursuant to *N.J.S.A.* 40A:9–6 because he held "de facto" the position of Chief of the Claims Section. The statute, entitled "De facto officers and employees; right to compensation" provides as follows:

Any person who has held or who may hereafter hold, de facto, any office or position in the public service of any county or municipality, and who has or shall have performed the duties thereof, shall be entitled to the emoluments and compensation appropriate to such office or position for the time in fact so held and may recover therefore in any court of competent jurisdiction, notwithstanding any refusal or failure of any other person or officer to approve or authorize the payment of said emoluments and compensation.

*N.J.S.A.* 40A:9–6.

The statute codifies the common law relating to county and municipal officers and in particular, the de facto officer doctrine. *See Casamasino v. Jersey City,* 158 *N.J.* 333, 350, 730 *A.*2d 287 (1999). Because the Legislature did not define "de facto officers," the common law definition must inform the meaning of the statute. *See id.* The doctrine, which dates back to 1431, has been characterized by the New Jersey Supreme Court as follows:

The essence of the de facto officer doctrine is that one who claims to be a public officer while in possession of an office and ostensibly exercising its functions lawfully and with the acquiescence of the public is a de facto officer whose lawful acts, so far as the rights of others are concerned, are, if done within the scope and by the apparent authority of the office, as valid and as binding as if the officer were legally qualified for the office and in full possession of it. [*In re Fichner,* 144 *N.J.* 459, 468, 677 *A.*2d 201 (1996).]

In what has been recognized as the leading case on the subject, *State v. Carroll,* 38 *Conn.* 449, 1871 *WL* 1596 (Sup.Ct.Err.1871), the highest court of Connecticut traced the development of the doctrine from the earliest published reports and set forth the following comprehensive definition:

An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the

interests of the public and third persons, where the duties of the office were exercised,

First, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be.

Second, under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like.

Third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.

Fourth, under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such. [*Id.* at 471–472, 677 A.2d 201]

The *Carroll* definition has been adopted and incorporated in our state's decisional law. *See, e.g., In re Fichner,* 144 *N.J.* at 469, 677 A.2d 201; *Jersey City v. Department of Civil Serv.,* 57 *N.J.Super.* 13, 27, 153 *A.2d* 757 (App.Div.1959).

■ Notwithstanding that there may be other commonly understood meanings of "de facto" in everyday parlance, this court is not free to adopt anything other than the *Carroll* definition, which "has had a remarkably concordant decisional lineage." *De Fazio v. Mayor and Council of Hoboken,* 12 *N.J.Super.* 515, 519, 79 *A.2d* 877 (App.Div.1951). The legislative history of *N.J.S.A.* 40A:9–6 does not indicate otherwise, and is generally of little assistance in the inquiry at hand. In the absence of any helpful legislative history, the court must rely upon generally accepted rules of statutory construction. It has been held that when the paying out of public funds to one purportedly rendering service to a municipality is involved, courts should take a strict view of the requirement that an enactment express with certainty the obligations to be undertaken by the taxpayers. *See Jersey City,* 57 *N.J.Super.* at 25, 153 *A.2d* 757.

*N.J.S.A.* 40A:9–6, strictly read, operates to confer benefits only upon those who meet the established definition of de facto officers. Here, neither party contends that plaintiff was ever appointed to the Section Chief position, thus rendering inapplicable the second,

third and fourth parts of the definition in *Carroll*, supra. Therefore, unless plaintiff has demonstrated that he fits the first paragraph of the definition, he cannot recover under the statute.

None of the cases cited by the plaintiff and defendant are factually analogous to the case before the court, because all involve failed appointments. *See Casamasino*, 158 *N.J.* at 369, 730 *A.*2d 287 (finding tax assessor appointed by mayor without advice and consent of city council nevertheless was a de facto officer whose acts were binding on the city and third parties); *In re Fichner*, 144 *N.J.* at 471, 677 *A.*2d 201 (holding that appointed members of occupational licensing board who lacked necessary qualifications were de facto office holders for purpose of review of board's decision to impose sanctions); *Suruda v. Jersey City Bd. of Educ.*, 167 *N.J.Super.* 331, 335, 400 *A.*2d 860 (Law Div.1979) (entitling two members of board of education appointed by lame duck mayor to indemnity for legal fees incurred in defense of appointment); *Adams v. Goldner*, 156 *N.J.Super.* 299, 303, 383 *A.*2d 1149 (App.Div.1978), *aff'd*, 79 *N.J.* 78, 397 *A.*2d 1088 (1979) (stating that although policeman's promotion to sergeant was invalid because there was no "vacancy" in the position, he was nevertheless entitled to extra compensation); *Jersey City*, 57 *N.J.Super.* at 44, 153 *A.*2d 757 (concluding that even if position occupied by hospital administrator had no legal existence because of defect in ordinance under which appointment was made, she was de facto employee entitled to re-employment rights under civil service system); *De Fazio*, 12 *N.J.Super.* at 522, 79 *A.*2d 877 (precluding finding of de facto status where plaintiff had knowledge that civil service commission did not approve his appointment and ouster of incumbent from position was disputed); *Petrone v. Newark*, 19 *N.J. Misc.* 318, 320, 19 *A.*2d 450 (1941) (compensating person who was appointed to board of assessment by an officer with apparent authority to make such appointment, and who undertook services in reliance thereon).

The absence of any known precedent for application of the statute in a situation where an employee unilaterally assumed the duties of a position without appointment or other public action,

renders this a case of first impression. A proper resolution of this issue must take into account that the de facto concept was judicially created based upon "considerations of policy and public convenience." *Jersey City,* 57 *N.J.Super.* at 27, 153 *A.2d* 757. The doctrine rests on policies such as the promotion of governmental stability and efficiency and public reliance on authority, demanding that governmental actions not be hampered by collateral inquiries as to the legal status of the officer performing the acts. *See id.* at 35, 153 *A.2d* 757. Without the doctrine, "uncertainty would cloud every action taken by officials who had not previously demonstrated perfect title." Kathryn A. Clokey, Note, *The De Facto Officer Doctrine: The Case for Continued Application,* 85 *Colum. L.Rev.* 1121, 1131 (1985). Hence, official acts performed by someone with the apparent authority to do so are valid and binding as to third parties and the public.

It is difficult to conceive of a better expression of apparent authority, the touchstone of the de facto doctrine, than the first paragraph of the definition in *Carroll,* supra. The language of that paragraph bespeaks an open and notorious occupancy of a public office, under color of authority but without benefit of appointment, i.e. a holding out to the public with the acquiescence of one's principal, as a result of which the acts of the officer are binding as to the principal and members of the public who rely thereon. The facts of this matter are not even remotely close, by plaintiff's own admission.

Specifically, Rawitz acknowledged that he never claimed he was Section Chief from April 27, 1993 to July 26, 1996. He never requested that he be given the title of Section Chief. During that time, he never demanded that his salary be equivalent to that of the past Section Chief; he requested a raise simply because he was doing more work. He never told anyone he was Section Chief, never held himself out as such and never induced people into thinking he was the Section Chief. Rawitz has not shown that anyone relied on him in that position.[1]

---

[1] Defendants raise the additional argument that Rawitz did not claim that he was Section Chief during his employment so that he could assert rights under

Having been directed to assume the duties of Section Chief on a prior occasion, plaintiff must be held to have known the difference this time around. He took on additional duties as required, perhaps·in the hope or expectation that he would ultimately be compensated for same or simply because he perceived he would be fired if he did not.[2] The court is satisfied that at various points in time he functioned as a one-man operation and at others as a litigation supervisor; however, he was not the de facto Section Chief as that term is defined.

■ No criticism is intended toward plaintiff for his assumption of additional duties as a matter of sheer necessity. Indeed, other persons in plaintiff's situation might have been motivated to quit. In this era of downsizing and reductions-in-force, surviving employees are required to work harder and smarter, often without commensurate compensation. The criteria for application of *N.J.S.A.* 40A:9–6 is not whether extra pay would be fair and equitable for a particular claimant, but rather whether the public interest is served and the underlying policies are furthered by the conferring of de facto officer status. This is not such a case.

Accordingly, judgment will be entered in favor of defendants. Counsel for defendants is directed to submit an appropriate form of Order.

---

the collective bargaining agreement (which excluded Section Chiefs from its coverage). In support of this argument, defendants point to memos written by plaintiff throughout the relevant period claiming coverage under the agreement, belying the position he now takes. Defendants urge that this is tantamount to an admission or estoppel by conduct. The court declines to make such a finding because it is not necessary to reach this issue. Neither does this court make any determination that plaintiff is guilty of any effort to defraud or deceive in acting as he did.

[2] By way of explanation for plaintiff's ultimate termination from employment, defendants presented some testimony indicating dissatisfaction with his work performance. This evidence is not relevant to the court's determination because the statutory language of *N.J.S.A.* 40A:9–6 does not require that duties be performed to the satisfaction of the employer. More importantly, one must perform the duties *and* meet one of the definitions of a de facto officer to invoke the statute. The latter requirement is not met here for the reasons stated.